**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEAPOINT SHIPPING LTD | : |
| | : |
| **Plaintiff,** | : |
| | : |
| - against - | : |
| | : |
| OCEANCONNECT MARINE | : |
| MINERVA BUNKERING (USA) LLC | : |
| | : |
| **Defendants.** | : |
| | : |

20 Civ. 6908 (JMF)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MINERVA BUNKERING (USA)'S MOTION TO STAY IN FAVOR OF ARBITRATION IN GENEVA

LENNON, MURPHY & PHILLIPS, LLC
Attorneys for Defendant
MINERVA BUNKERING (USA) LLC

The Graybar Building
420 Lexington Ave., Ste. 300
New York, New York 10170
(212) 490-6050 (T)
(212) 490-6070 (F)

Keith W. Heard
Of counsel

# TABLE OF CONTENTS

Page

**Preliminary Statement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      **The bunker supply transaction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      **The importance of Minerva's Bunkering Terms** . . . . . . . . . . . . . . . . . . . . .   4

**Legal Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    **POINT I**

    **THIS MOTION IS GOVERNED
BY CHAPERS 1 AND 2 OF TITLE 9
OF THE UNITED STATE CODE
AND MINERVA IS ENTITLED TO
A STAY UNDER 9 U.S.C. § 3** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    **POINT II**

    **THERE IS A STRONG FEDERAL
POLICY FAVORING ARBITRATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **POINT III**

    **THE ARBITRATION CLAUSE IN THE
MINERVA BUNKERING TERMS 2019
IS A "BROAD" CLAUSE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

    **POINT IV**

    **AS OWNER OF THE VESSEL,
SEAPOINT SHIPPING LTD. IS
DEFINED AS A PARTY TO
MINERVA'S BUNKERING TERMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    **POINT V**

    **NON-SIGNATORIES TO A CONTRACT
CAN BE REQUIRED TO ARBITRATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**POINT VI**

**PLAINTIFF IS REQUIRED TO**
**ARBITRATE WITH MINERVA ON THE**
**BASIS OF THE ESTOPPEL THEORY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

**POINT VII**

**AS A THIRD-PARTY BENEFICIARY OF THE**
**OCM/MINERVA CONTRACT, PLAINTIFF IS**
**REQUIRED TO ARBITRATE WITH MINERVA** . . . . . . . . . . . . . . . . . . . . . . . . 16

**CONCLUSION**

**FOR THE REASONS SET FORTH HEREIN, THIS HONORABLE**
**COURT SHOULD GRANT THE MOTION BY DEFENDANT**
**MINERVA BUNKERING (USA) LLC FOR A STAY OF PLAINTIFF'S**
**CLAIMS AGAINST IT ON THE BASIS OF THE ARBITRATION**
**CLAUSE IN THE BUNKER SUPPLY CONTRACT BETWEEN**
**MINERVA AND CO-DEFENDANT OCEANCONNECT MARINE** . . . . . . . . . . 19

# **TABLE OF AUTHORITIES**

Pages

<u>Cases</u>

*Alghanim v. Alghanim*, 828 F. Supp. 2d 636 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . 13

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349,
(2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 14

*AmTrust N. Am., Inc. v. Safebuilt Ins. Servs.*, No. 14 Civ. 09494, 2015
U.S. Dist. LEXIS 162515 (S.D.N.Y. Dec. 1, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bank of Am., N.A. v. Diamond State Ins. Co.*, 01 Civ. 0645, 2002 U.S. Dist.
LEXIS 23225 (S.D.N.Y. Dec. 4, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Borsack v. Chalk & Vermilion Fine Arts*, 974 F. Supp. 293 (S.D.N.Y. 1997). . . . . . . . . 17

*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993) . . . . . . . . . . . . 16

*Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390,
(E.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 17

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16 (2d Cir. 1995) . . . . . . . . . 9

*Conoco, Inc. v. Skinner*, 970 F.2d 1206 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.*, 372 U.S. 697 (1963). . . . . . . 15

*Energy Transp., LTD. v. M.V. San Sebastian*, 348 F. Supp. 2d 186 (S.D.N.Y. 2004). . . . 10

*Etransmedia Tech., Inc. v. Nephrology Assocs., P.C.*, No. 11-CV-1042, 2012
U.S. Dist. LEXIS 115636 (N.D.N.Y. Aug. 16, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA,*
*LLC*, 140 S. Ct. 1637, 1644, 2020 U.S. LEXIS 3029 (2020). . . . . . . . . . . . . . . . . . . 6, 14

*Insurance Co. of N. Am. v. ABB Power Generation*, 925 F. Supp. 1053,
(S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Integr8 Fuels, Inc. v. Daelim Corp.*, No. 17 CV 2191, 2017 U.S. Dist. LEXIS
62702 (S.D.N.Y. April 25, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

*Kuklachev v. Gelfman*, 600 F. Supp. 2d 437 (E.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . 8

*Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F. Supp. 1146 (S.D.N.Y. 1973). . . . . . . . . . . 7

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218
(2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC*, 268 F3d 58
(2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1
103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*NBC v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . .   13

*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72 (2d Cir. 1998) . . . . . . . . . . . . . . . . .   9

*Reibstein v. CEDU/Rocky Mt. Academy*, NO. 00-1781, 2000 U.S. Dist. LEXIS
18206 (E.D.Pa. Dec. 20, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) . . . .7, 13, 14

*UPT Pool Ltd. v. Dynamic Oil Trading (Sing.) Pte. Ltd.*, 14-CV-9262, 2015 U.S. Dist. LEXIS
85950 (S.D.N.Y. July 1, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135 (2d Cir. 2001) . . .   6-7

Statutes

Title 9, Chapter 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Title 9, Chapter 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

9 U.S.C. § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

9 U.S.C. § 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SEAPOINT SHIPPING LTD                         :
                                              :
              Plaintiff,                      :
                                              :
          - against -                         :                   20 Civ. 6908 (JMF)
                                              :
OCEANCONNECT MARINE                           :
MINERVA BUNKERING (USA) LLC                   :
                                              :
              Defendants.                     :
_____       :

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MINERVA BUNKERING (USA)'S
## MOTION TO STAY IN FAVOR OF
## ARBITRATION IN GENEVA

Defendant Minerva Bunkering (USA) LLC ("Minerva") submits this Memorandum of Law, along with the accompanying declarations of Alexandre Soeur and Christopher Roberts, in support of its motion to stay the claims plaintiff Seapoint Shipping Ltd. ("Seapoint") has asserted against Minerva on the basis that the claims are subject to arbitration pursuant to the Geneva arbitration clause in Minerva's Bunkering Terms 2019 ("Terms"), by which plaintiff is bound.

### Preliminary Statement

In the Amended Complaint (Docket no. 23), plaintiff has alleged claims against Minerva for negligence, misrepresentation and gross negligence that fall within the scope of the broad arbitration clause in the terms and conditions pursuant to which Minerva provided marine fuel to plaintiff's vessel, the CAPTAIN X. KYRIAKOU ("the Vessel"), in January of this year.  As a result, plaintiff's claims must be stayed pursuant to 9 U.S.C. § 3 so that, if plaintiff choses to do so, they can be pursued in the proper forum, which is arbitration in Geneva, Switzerland.

## Factual Background

**The bunker supply transaction**

Near the end of last year, Athenian Sea Carriers, the Vessel's commercial and technical manager, "contacted [defendant] OceanConnect on behalf of the Plaintiff to arrange the purchase of bunker fuel for the Vessel."  Amended Complaint at ¶¶ 2 and 8.  Either because OceanConnect Marine ("OCM") was acting simply as a trader or because it lacked the resources and equipment to supply the fuel to the ship, OCM contracted to have Minerva furnish the fuel when the Vessel called at the at the Louisiana Offshore Oil Port ("LOOP") in January.[1]  Roberts declaration, ¶ 8.

As Christopher Roberts, Minerva's Head of Sales – Americas, explains in his declaration, "Minerva received OCM's inquiry shortly before Christmas 2019 and confirmed it in a Sales Order Confirmation dated December 21, 2019." The Confirmation, which is an exhibit to Mr. Roberts' declaration, identified the "Buyer/Account" as:

> MV CAPTAIN X KYRIAKOU AND/OR OCEANCONNECT MARINE
> INC AND JOINTLY AND SEVERALLY OWNERS/ MASTER/
> MANAGING OWNERS/ OPERATORS/ MANAGERS/ DISPONENT
> OWNERS AND CHARTERERS

In addition, the Confirmation specifically referenced the Minerva Bunkering Terms 2019, incorporated them by reference and provided the Internet address where they were available online.  The Geneva arbitration clause on which this motion is based appears in Clause 25(a) of the Terms and reads in part as follows:

> [A]ny dispute arising out of or in connection with the Contract shall be referred to arbitration in Geneva, Switzerland.

---

[1] In fact, this is a common scenario.  For example, in *UPT Pool Ltd. v. Dynamic Oil Trading (Sing.) Pte. Ltd.*, 14-CV-9262, 2015 U.S. Dist. LEXIS 85950 at *20-21 (S.D.N.Y. July 1, 2015), the Court described the transactions at issue as follows: "The Plaintiffs in the Interpleader are owners and charterers . . . of various shipping vessels . . . that contracted with one or more of the O.W. Entities, either directly or through a broker, for the supply of fuel. In most cases, an O.W. Entity did not provide the fuel directly but contracted with a third party fuel supplier . . . that physically delivered the bunkers to the Vessel." The Court said the O.W. Entities' role was that of "middle-man" in many of these transactions."

> The arbitration shall be conducted in accordance with the Swiss Rules of
> International Arbitration of the Swiss Chambers' Arbitration Institution ("Swiss
> Rules") in force on the date on which the Notice of Arbitration is submitted in
> accordance with these Rules. The language of the arbitration shall be English.

Soeur decl, Exh. A, Clause 25(a).

Minerva supplied two grades of marine fuel to the Vessel on January 12, 2020, furnishing 3,140 metric tons of Very Low Sulfur Fuel Oil ("VLSFO") and 83 metric tons of Low Sulfur Marine Gas Oil ("LSMGO").  The Vessel confirmed Minerva's fuel delivery by having one of its officers sign two Bunker Delivery Receipts, one for the VLSFO and one for the LSMGO. Roberts decl., Exhs. B and C.  The Bunker Delivery Receipts recite the following:

> The marine fuel described herein is delivered in accordance with the applicable
> terms and conditions of sale (a copy of which Buyer acknowledges he has received
> prior to delivery) and on credit of the Owner and/or Operators and/or Charterers of
> the vessel.

According to Mr. Roberts, "[t]he terms and conditions of sale were contained in the Sales Order Confirmation and included the Minerva Bunkering Terms 2019." Roberts decl., ¶ 12.

After the fuel was supplied to the Vessel at LOOP, it sailed from that location and began a laden voyage to one or more discharge ports in the Far East.  Mr. Roberts explains in his declaration that "[a]fter the fuel was supplied, OCM notified Minerva that the vessel was reporting a problem with aspects of the VLSFO that had been stemmed at LOOP."  *Id.* at 15; *see also*, Amended Complaint at ¶ 15.

Plaintiff contends "the bunkers were off-spec" and that this allegedly caused certain problems in using the fuel on the ship.  Amended Complaint at ¶¶ 13 and 22.  However, those are issues for the arbitration, where the merits of plaintiffs' claims, if any, are to be considered.

**The importance of Minerva's Bunkering Terms**

Contractual terms and conditions are very important to physical bunker suppliers such as Minerva.  Alexandre Soeur, the Global Head of Insurance of Mercuria Energy Trading S.A., which ultimately owns Minerva, explains in his declaration that, as a physical bunker supplier, "Minerva is exposed to certain obvious risks," requiring careful risk management. Soeur decl., ¶ 4. Although the dollar amounts involved in some of Minerva's transactions, like this one, are substantial,[2] the economic reality of the bunker supply business is "that Minerva has a relatively modest earning on each supply transaction." *Id.* at ¶ 8. Thus, marine fuel supply becomes, of necessity, a high volume business, which serves to enlarge the risks.

The increased risk highlights the importance of doing business with the certainty and protection that well-drafted contractual terms and conditions provide. Mr. Soeur explains this in his declaration as follows:

> Minerva's risk management is linked to the terms and conditions set forth in its Bunkering Terms, which form part of every contract to sell bunkers/marine fuel to which Minerva agrees. The overall aim is obviously to reduce claims against the company so that Minerva's risks in engaging in the business are commensurate with Minerva's earnings per transaction (as further discussed below), and that largely hinges on whether Minerva's terms and conditions apply, which is what the company plans and intends.  When, as Minerva contends in this case, its terms and conditions apply, it is a much easier task for the company to assess and deal with the extent of its liability, if any.

> A limitation of liability has been inserted in the Bunkering Terms that form part of the greater risk management approach Minerva has adopted. Minerva limits liability on a per transaction, contract level by way of its terms and conditions and obtains insurance to cover, among other things,  the risk exposure that remains with Minerva under the terms. The combination of terms and conditions and insurance enables Minerva to control and contain the risks inherent in the industry in which it operates.

*Id.* at ¶¶ 5-6.

---

[2] Minerva's invoice for the fuel supplied to plaintiff's vessel was in the amount of $2,098,270.00. Roberts decl., Exh D.

Mr. Soeur also points out that Minerva's Terms are not unusual or obscure. To the contrary, they are based on a standard-form industry contract developed by BIMCO, the Baltic and International Maritime Council, which has offices in Copenhagen and Singapore. *Id.* at ¶ 9. "In fact," Mr. Soeur explains, "Minerva's Bunkering Terms are framed around the BIMCO Bunker Terms with relatively few amendments." *Id.* This represents an objective or at least neutral approach because BIMCO is not a bunker supplier industry group but is instead a *shipowners'* industry group.[3] Thus, "[t]he design of Minerva's Terms around the BIMCO Bunker Terms was done in order to choose a balanced approach recognizable for any party in the industry." *Id.* at ¶ 10.

Finally, Mr. Soeur points out that a shipowner such as Seapoint cannot possibly suggest it is surprised to learn that a physical bunker supplier such as Minerva does business according to contractual terms and conditions.  He writes as follows:

> Any professional buyer of marine fuel will be aware that terms and conditions apply in each level of the contractual chain of supplies. No shipowner or operator would reasonably expect that marine fuel will be put on the market by any industry party without incorporation of terms and conditions to regulate the parties' rights and obligations. It would simply be inconsistent with the market conditions for sale and purchase of marine fuel to expect that such supplies would be governed by default law. The initiative by BIMCO to produce standard terms and conditions for supply of marine fuel also reflects that such contracts are invariably governed by terms and on conditions.

*Id.* at ¶ 11.

Among other things, Mr. Soeur's comments serve to emphasize the unfairness and commercial unreasonableness of allowing plaintiff to circumvent Minerva's Bunkering Terms, with their arbitration clause.

---

[3] According to Wikipedia, https://en.wikipedia.org/wiki/Baltic_and_International_Maritime_Council, "BIMCO is the largest of the international shipping associations *representing shipowners*; its membership controls around 65 percent of the world's tonnage and it has members in more than 120 countries, including managers, brokers and agents. The association's main objective is to protect its global membership through the provision of information and advice, and while promoting fair business practices, facilitate harmonization and standardization of commercial shipping practices and contracts" (emphasis added).

**Legal Argument**

**POINT I**

**THIS MOTION IS GOVERNED
BY CHAPERS 1 AND 2 OF TITLE 9
OF THE UNITED STATE CODE
AND MINERVA IS ENTITLED TO
A STAY UNDER 9 U.S.C.** § 3

As the Court undoubtedly knows, Chapter 1 of Title 9 of the U.S. Code is the Federal

Arbitration Act ("FAA") and Chapter 2 is the Convention on the Recognition and Enforcement

of Foreign Arbitral Awards ("the Convention"), which is also known as "the New York

Convention."[4]  The Second Circuit Court of Appeals has observed that "[a]n agreement to

arbitrate exists within the meaning of the Convention and the FAA if: (1) there is a written

agreement; (2) the writing provides for arbitration in the territory of a signatory of the

convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely

domestic in scope." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146

(2d Cir. 2001)(citations omitted).

These requirements are easily satisfied here. The agreement by which Minerva sold to

OCM the fuel that was supplied to the Vessel was in writing. *See* Roberts decl., Exh. A; Soeur

decl., Exh. A. The Minerva Bunkering Terms 2019 contain a provision requiring arbitration in

Geneva, Switzerland and Switzerland is a signatory of the Convention.[5] The subject matter of the

Minerva/OCM bunker supply contract and the facts of this action are clearly "commercial."

And, finally, the subject matter of this case is "not entirely domestic in scope," involving, as it

does, fuel supplied to a vessel flying the Marshall Islands flag,[6] owned by a non-U.S. foreign

---

[4] "In 1970, the United States acceded to the New York Convention, and Congress enacted implementing legislation in Chapter 2 of the FAA." *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644, 2020 U.S. LEXIS 3029 at *11 (2020).
[5] www.newyorkconvention.org/list+of+contracting+states
[6] www.balticshipping.com/vessel/imo/9602928

corporation,[7] which fuel was consumed in large part on a transocean voyage to discharge cargo

at one or more ports in Japan.[8]  Thus, insofar as plaintiff's claims against Minerva are concerned,

"[a]n agreement to arbitrate exists within the meaning of the Convention and the FAA."  *U.S.*

*Titan v. Guangzhou*, 241 F.3d at 146.

The FAA's provisions apply to actions governed by the Convention.  Specifically, 9 U.S.C.

§ 208 provides that "Chapter 1 [i.e., the FAA] applies to actions and proceedings brought under

this chapter [i.e., Chapter 2] to the extent that chapter is not in conflict with this chapter or the

Convention as ratified by the United States."  9 U.S.C. § 3, entitled "Stay of proceedings where

issue therein referable to arbitration," reads as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon
> any issue referable to arbitration under an agreement in writing for such arbitration,
> the court in which such suit is pending, upon being satisfied that the issue involved
> in such suit or proceeding is referable to arbitration under such an agreement, shall
> on application of one of the parties stay the trial of the action until such arbitration
> has been had in accordance with the terms of the agreement, providing the applicant
> for the stay is not in default in proceeding with such arbitration.

Thus, the Court clearly has the power to stay prosecution of plaintiff's claims against Minerva.

*Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F. Supp. 1146, 1148 (S.D.N.Y. 1973)("A Federal court

is empowered under 9 U.S.C. § 3 to stay its proceedings where the issue involved is referrable to

arbitration under an agreement to arbitrate found in a contract evincing a transaction in

commerce.").                                    **POINT II**

**THERE IS A STRONG FEDERAL
POLICY FAVORING ARBITRATION**

As the Second Circuit noted in *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d

773, 776 (2d Cir. 1995), "there is a strong and 'liberal federal policy favoring arbitration

---

[7] Amended Complaint at ¶ 1 (Docket no. 23).
[8] Id. at ¶ 16.

agreements,' *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985) (quotations omitted)." Thus, in *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013), the Court wrote as follows:

> The Court must also keep in mind certain public policy concerns when deciding whether to compel arbitration. Section 2 of the FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008). The Court notes that the FAA reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740, 1745, 179 L. Ed. 2d 742 (2011) (internal quotation marks and citations omitted). "[T]he FAA was enacted to replace judicial indisposition to arbitration, and is an expression of a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (internal quotation marks and citations omitted). In fact, the Second Circuit has said that "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (internal quotation marks omitted).

And, in *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), the Supreme Court wrote this:

> [T[he Courts of Appeals have . . . consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .

*Accord: Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 n.5 (2009).

**POINT III**

**THE ARBITRATION CLAUSE IN THE
MINERVA BUNKERING TERMS 2019
IS A "BROAD" CLAUSE**

As the Court pointed out in *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 460 (E.D.N.Y. 2009), "[t]he strong federal presumption in favor of arbitrability applies with greater force when

an arbitration clause is a broad one. *See AT & T Techs.*, 475 U.S. at 650." As this quote implies, the law distinguishes between "broad" and "narrow" arbitration clauses. For example, in *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998), the Second Circuit ruled that a clause that subjected to arbitration "[a]ny dispute, controversy or claim arising under or in connection with" the agreement "represents the prototypical broad arbitration provision." *See also*, *Etransmedia Tech., Inc. v. Nephrology Assocs., P.C.*, No. 11-CV-1042, 2012 U.S. Dist. LEXIS 115636 at * (N.D.N.Y. Aug. 16, 2012), where a clause providing that "[a]ny dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration" was held to be a broad clause.

Both of these examples are very similar and, in fact, nearly identical to the clause in Minerva's Terms, which provides that "any dispute arising out of or in connection with the Contract shall be referred to arbitration in Geneva, Switzerland." Soeur decl., Exh. A, Clause 25(a). Thus, insofar as Minerva's Terms are concerned, this case involves a *broad* arbitration clause.

As the Second Circuit explained in *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218 (2d Cir. 2001), "[w]here the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.' *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)." Certainly, the dispute here involves "the parties' rights and obligations under" the contract by which Minerva sold the bunkers. Thus, there is a presumption of arbitrability.[9]

---

[9] The fact that plaintiff's claims against Minerva sound in tort rather than contract does not remove them from the scope of the arbitration clause. As this Court said in *Insurance Co. of N. Am. v. ABB Power Generation*, 925 F. Supp. 1053, 1062 (S.D.N.Y. 1996), "tort claims are covered by contractual agreements to arbitrate if the factual allegations

## POINT IV

## AS OWNER OF THE VESSEL,
## SEAPOINT SHIPPING LTD. IS
## DEFINED AS A PARTY TO
## <u>MINERVA'S BUNKERING TERMS</u>

In the "Definitions" section of Minerva's Bunkering Terms 2019, "'Party' means Sellers

or Buyers" and the definition of "Buyers" is as follows:

> "Buyers" means the Vessel and jointly and severally her Master, ***Owners***,
> Managers, Operators, Disponent Owners, Time Charterers, Bareboat Charterers,
> Charterers and the party stated in the Confirmation Note contracting to purchase,
> take delivery and pay for the Marine Fuels.  (Emphasis added.)

The term "Buyers" then appears throughout the Terms.[10]   Here, for example, are just a few of
them:

### 2. Specifications/Grades/Quality

(a) The **Buyers** shall have the sole responsibility for the nomination of the
specifications and grades of Marine Fuels fit for use by the Vessel and determine
(if applicable) the potential compatibility with any bunkers already on board the
Vessel, as well as to assure that the Marine Fuels do not jeopardize the safety of the
Vessel, adversely affect the performance of the Vessel's machinery, harm
personnel or contribute to additional air pollution.

### 9. Claims

### (b) Quality/Specification

(iii) In the event that the **Buyers** were to consider a potential de-bunkering of the
Marine Fuels, based on full and undisputable written evidence that the Marine Fuels
are unsuitable for use by the Vessel, the advice of the Sellers must first be sought
and obtained. The **Buyers** are further obliged to closely work and co-operate with
the Sellers in relation to every single specific action to be taken in respect of the
de-bunkering operation. All damages, losses, costs, and expenses which may result
from any unilateral decision taken by the **Buyers** shall be solely and exclusively
born by the **Buyers**.

---

underlying the claims are related to matters that are clearly arbitrable."  *Accord: Energy Transp., LTD. v. M.V. San
Sebastian*, 348 F. Supp. 2d 186 (S.D.N.Y. 2004)(negligence claim held arbitrable), and *Bank of Am., N.A. v. Diamond
State Ins. Co.*, 01 Civ. 0645, 2002 U.S. Dist. LEXIS 23225 (S.D.N.Y. Dec. 4, 2002)(claims for negligence and
recklessness held arbitrable).
[10] In fact, a word search conducted by the attorney who wrote this Memorandum of Law shows that "Buyers" appears
in the Terms a total of 69 times.

**27. Entire Agreement and Priority of Terms**

(a) The written terms of the Contract comprise the entire agreement between the **Buyers** and the Sellers in relation to the sale and purchase of the Marine Fuels and supersede all previous agreements whether oral or written between the Parties in relation thereto. No amendments to a Contract may be made unless agreed by both Parties in writing.

(d) Unless otherwise agreed, the General Terms and Conditions shall apply to any sale of Marine Fuels by the Sellers to the **Buyers** regardless of whether an Order Confirmation has been issued or not.

Thus, as a matter of definition and contract interpretation, plaintiff is a party to the Minerva Terms, which, of course, include the Geneva arbitration clause.

This case has interesting similarities to another dispute that was litigated before this Court. In *Integr8 Fuels, Inc. v. Daelim Corp.*, No. 17 CV 2191, 2017 U.S. Dist. LEXIS 62702 (S.D.N.Y. April 25, 2017), Daelim, a vessel's bareboat charterer (a status similar to actually being a shipowner)[11] demanded arbitration of Integr8, a marine fuels provider, to recover indemnity and to obtain declaratory and injunctive relief as a result of Integr8's arrest of a vessel in Dubai for failure to pay for fuel supplied to the ship in the Far East.  In the District Court, Integr8 sought a Temporary Restraining Order and Preliminary Injunction to prevent Daelim from pursuing the arbitration. Daelim argued that, although it was not a signatory to the bunker supply contract, it was entitled to arbitrate with Integr8 because of the wording of the fuel supplier's General Terms & Conditions ("GTC").

The Court noted that the contract by which Integr8 sold the fuel defined "Buyer" as "Dynamic Oil Trading (Singapore Pte Ltd) AND JOINTLY AND SEVERALLY OWNERS/ MANAGING OWNERS/OPERATORS/MANAGERS/DISPONENT OWNERS/ CHARTERERS."

---

[11]  "For most purposes, the charterer in a demise [or bareboat charter] is treated as an owner, termed *pro hac vice*." Thomas J. Schoenbaum, *Admiralty and Maritime Law* 382 (1987)(quoted in *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1211 n.4 (3d Cir. 1992).

*Id.* at *3. As indicated, Daelim was a charterer of the ship and was therefore arguably included in the above definition. Moreover, the bunker supply contract provided that "Integr8 Fuels Inc. General Terms and Conditions (including the arbitration clause within those General Terms and Conditions) will apply to this contract."[12]  *Id.*  After Interg8 arrested the DL NAVIG8 in Dubai, Daelim demanded arbitration of Integr8 in New York and, according to the Court, "[t]he Demand identifies the operative arbitration agreement as the one contained in the Integr8 GTC." *Id.* at *4.

In its Complaint, Intgr8 sought "a declaratory judgment that there is no enforceable arbitration agreement between Daelim and Integr8." *Id.* at *6. Rejecting this contention, the Court wrote as follows:

> The record currently before the Court shows that Integr8 entered into a written agreement, drafted by Integr8, with Dynamic. That agreement included a defined term, "Buyer," that covered Dynamic as well as the Charterers of the vessel. Daelim has proffered uncontested evidence indicating that Daelim was the Charterer of the vessel at the time Integr8 contracted with Dynamic. The Court accordingly concludes that the Integr8 Contract, which Integr8 drafted, embodies Integr8's agreement to arbitrate any dispute even incidental to the bunker stem transaction, with a diverse range of parties in interest that includes Daelim, as the Charterer of the vessel. That contract expressly incorporated the arbitration clause of the Integr8 GTC, which also defines the term "Buyer" to include the charterers of the vessel. Accordingly, the Court concludes that, on the present record, Integr8 has not demonstrated a likelihood of success, or even sufficiently serious questions going to the merits, on its claim that that it is not a party to an agreement to arbitrate with Daelim.

*Id.* at *6-7.

This case is the mirror image of *Integr8 v. Daelim*.  Here, as there, the fuel supply contract defines the Buyer as including the party (a shipowner here and a bareboat charterer there) that has asserted claims against the bunker supplier (Minerva here and Integr8 there).  Just as the Court in

---

[12] The Integr8 Fuels Inc. General Terms and Conditions included an arbitration clause providing, in pertinent part, that "[a]ny dispute arising under, in connection with or incidental to this Contract shall be heard and decided at New York City, New York State, by three persons." *Integr8 Fuels v. Daelim Corp.*, 2017 U.S. Dist. LEXIS 62702 at *3.

*Integr8 v. Daelim* concluded that the parties were required to arbitrate the claims pursuant to the bunker supplier's Terms & Conditions, so too should the same result occur here.

**POINT V**

**NON-SIGNATORIES TO A CONTRACT
CAN BE REQUIRED TO ARBITRATE**

The basic rule is that "[o]rdinarily, because commercial arbitration is a creature of contract, only the parties to the arbitration contract are bound to participate." *NBC v. Bear Stearns & Co.*, 165 F.3d 184, 186 (2d Cir. 1999). However, as the Second Circuit also said in *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995):

> "It does not follow, however, that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." *Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir. 1960); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). This Court has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the "ordinary principles of contract and agency." *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980); *see also A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974).

*Accord: American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)("nonsignatories may be bound by arbitration agreements entered into by others").

The fact that this is a Convention case does not change the rule with respect to binding non-signatories. Thus, in *Alghanim v. Alghanim*, 828 F. Supp. 2d 636 (S.D.N.Y. 2011), a Convention case, this Court wrote as follows:

> Pursuant to federal law, *in the particular context of the Convention*, the fact that non-signatories did not sign a written arbitration agreement "does not foreclose the application of the well-established contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from agreements signed by others." *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 301 (S.D.N.Y. 1997) (finding signatory defendants could compel arbitration against non-signatory plaintiff). *See also Cargill Intern. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1020 (2d Cir. 1993) (suggesting that were a non-signatory found to be a third-party beneficiary "it may be proper for the district court to enforce the arbitration agreement against [a signatory]"). (Emphasis added.)

- 13 -

*Alghanim*, 828 F. Supp. 2d at 647.  *Accord: GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644, 2020 U.S. LEXIS 3029 (2020).

As previously indicated, in *Thomson-CSF,* 64 F.3d at 776, the Second Circuit "made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)."  Continuing, the Court wrote that "we have recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF,* 64 F.3d at 776.  In addition, as shown in detail in Point VII below, it is also accepted now that a non-signatory can be required to arbitrate on the basis that it is a third-party beneficiary of the contract in which the agreement to arbitrate appears.

## POINT VI

### PLAINTIFF IS REQUIRED TO ARBITRATE WITH MINERVA ON THE BASIS OF THE ESTOPPEL THEORY

Estoppel is one of the five theories for binding non-signatories the Second Circuit listed in *Thomsen-CSF*.  In *MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC*, 268 F3d 58, 61 (2d Cir. 2001), the Court of Appeals explained that "[u]nder the estoppel theory, a company 'knowingly exploiting [an] agreement [with an arbitration clause can be] estopped from avoiding arbitration despite having never signed the agreement'," quoting from *Thomsen-CSF,* 64 F.3d at 778. The Court added that "[t]he benefits must be direct -- which is to say, flowing directly from the agreement." *MAG Portfolio*, 268 F3d at 61.

In *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d at 353, the Second Circuit ruled that the vessel owners and insurance underwriters were required to submit their

claims against plaintiff ABS to arbitration on the basis of the estoppel theory because they "receive[d] a 'direct benefit' from a contract [between ABS and the shipyard] containing an arbitration clause."

Likewise, in this case, plaintiff Seapoint received a direct benefit from the contract between OCM and Minerva. Seapoint's vessel needed a substantial amount of fuel for the long voyage from offshore Louisiana to the Far East. Seapoint reached out to OCM, who struck a deal with Minerva. Thus, *by virtue of the contract between OCM and Minerva*, on January 12, 2020, the Vessel received 3,140 metric tons of Very Low Sulfur Fuel Oil ("VLSFO") and 83 metric tons of Low Sulfur Marine Gas Oil ("LSMGO").[13]  As Mr. Roberts explains in his declaration, OCM was just a middleman, an intermediary.[14] Roberts decl., ¶¶ 5-6. It was Minerva who actually supplied the fuel to the ship[15] and primarily took the risk that something could go wrong.

Undoubtedly, OCM was looking to source the fuel from a less expensive seller so it could profit on the difference between what the physical supplier (Minerva) charged and what OCM charged Seapoint. Thus, as a matter of simple economics, Seapoint too would have benefited from the fact that Minerva supplied the fuel to the Vessel.

Certainty is obviously important in commercial transactions.[16]  Dealing with an established bunker supplier with readily available terms and conditions of sale and supply, such as Minerva, gave OCM certainty from which Seapoint, as the shipowner and primary beneficiary of the fuel supply transaction, clearly and directly benefited.

---

[13] Amended Complaint at ¶ 9 (Docket no. 23).
[14] *See* footnote 1, *supra*, re bunker traders as "middlemen."
[15] Amended Complaint at ¶ ¶ 12 and 15.
[16] As Justice Harlan said in his concurring opinion in *Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.*, 372 U.S. 697, 698 (1963), "[c]ertainty in the law governing commercial transactions of this kind is an overriding consideration."

And, finally, when a problem developed with the fuel in late January, as Seapoint alleges in the Amended Complaint, it had the comfort and advantage of being able to obtain information and support from a leading, mainstream bunker supplier, not some marginal or fly-by-night player, of which there are undoubtedly some in the international marine fuel supply business.

Since Seapoint received a direct benefit from the contract OCM agreed with Minerva, as a matter of fact and law, Seapoint is estopped to deny that it is bound to arbitrate its claims against Minerva in Geneva, pursuant to the Minerva Bunkering Terms 2019.

**POINT VII**

**AS A THIRD-PARTY BENEFICIARY OF THE**
**OCM/MINERVA CONTRACT, PLAINTIFF IS**
**<u>REQUIRED TO ARBITRATE WITH MINERVA</u>**

As explained in Point V above, a non-signatory can be compelled to arbitrate disputes if it is a third-party beneficiary of the contract containing the arbitration clause.  Thus, in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), involving an effort to compel non-signatories to arbitrate, the Supreme Court noted that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption,  piercing the corporate veil, alter ego, incorporation by reference, *third-party beneficiary theories*, waiver and estoppel,' 21 R. Lord, Williston on Contracts § 57:19, p 183 (4th ed. 2001)" (emphasis added).

In *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993), the Second Circuit reversed the denial of a motion to compel arbitration, remanding the case for the district judge to consider plaintiff importer's argument that it was a third-party beneficiary of the charter party contract and, as such, was entitled to demand arbitration of the defendant shipowner, who, unlike plaintiff, was a signatory to the contract. The Court observed that "if [the importer] CBV is found to be a third party beneficiary to the Charter Party, it may be proper for the district court to

enforce the arbitration agreement against [defendant] Novorossiysk." *Id*. at 1020. Going further, the Court explained that "[i]n order to enforce the agreement as a third party beneficiary, CBV must show that "'the parties to that contract intended to confer a benefit on [it] when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to [it].' *McPheeters v. McGinn, Smith and Co., Inc.*, 953 F.2d 771, 773 (2d Cir. 1992)." 991 F.2d at 1020.

Additionally, in *Borsack v. Chalk & Vermilion Fine Arts*, 974 F. Supp. 293 (S.D.N.Y. 1997), this Court held that although the plaintiff was a non-signatory to a licensing agreement containing an arbitration clause, plaintiff was an intended third-party beneficiary of the agreement, and was therefore compelled to abide by the arbitration provision. The Court observed that "[o]ur Court of Appeals has rejected the proposition that only signatories to an arbitration agreement can be bound by its terms, applying instead ordinary principles of contract and agency to determine which parties are bound by an agreement to arbitrate." *Id.* at 299. *Accord: Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 396 (E.D.N.Y. 2013)("several district courts have held that a non-signatory third-party beneficiary suing for breach of contract is bound by an arbitration clause in the contract"), and *Reibstein v. CEDU/Rocky Mt. Academy*, NO. 00-1781, 2000 U.S. Dist. LEXIS 18206 at *21 (E.D.Pa. Dec. 20, 2000)("Third party beneficiaries to a contract may be compelled to arbitrate").

We turn now to the elements of third-party beneficiary status.  In *AmTrust N. Am., Inc. v. Safebuilt Ins. Servs.*, No. 14 Civ. 09494, 2015 U.S. Dist. LEXIS 162515 (S.D.N.Y. Dec. 1, 2015), this Court wrote the following:

> For a contract to confer third-party beneficiary status, three elements must be established: (1) there must be a valid and binding contract between other parties, (2) the contract was intended for the benefit of some third party; and (3) the benefit to the third party must be sufficiently immediate, rather than incidental, so that it indicates the assumption by the contracting parties of a duty to compensate the third

party if the benefit is lost. *Mendel v. Henry Phipps Plaza West, Inc.*, 6 N.Y.3d 783, 786, 844 N.E.2d 748, 811 N.Y.S.2d 294 (2006).

All three elements exist here. First, there was clearly a "valid and binding contract" whereby OCM agreed to buy and Minerva agreed to sell the fuel to be supplied to plaintiff's Vessel. Second, that contract was expressly intended for the benefit of a third party – i.e., plaintiff, as owner of the Vessel. Neither OCM nor Minerva was going to use the products being sold, which were marine fuels whose purpose was to power an ocean-going vessel's main engine and auxiliary equipment. Indeed, it was clearly stated in the Sales Order Confirmation – the bunker supply contract – that the fuel was to be supplied to plaintiff's vessel, the CAPTAIN X. KYRIAKOU. *See* Roberts decl., Exh. A. Finally, the contract clearly anticipates that if its benefit was lost – for example, because the fuel was somehow deficient in quantity or quality – there was a duty to compensate the fuel's recipient within the bounds of the contract. This can be seen, for example, in the contract's provisions with respect to the assertion of claims by "Buyers," which, as previously indicated, is defined in Minerva's Terms to include the recipient vessel's "Owners, Managers, Operators, Disponent Owners, Time Charterers [and] Bareboat Charterers." *See, generally*, Clause 9, "Claims," in the Minerva Bunkering Terms 2019. Soeur decl, Exh. A.

Plaintiff was undoubtedly a third-party beneficiary of the contract by which Minerva sold the marine fuel to OCM. Indeed, plaintiff itself created the need for the contract when it ordered and agreed to buy the fuel from OCM. The sole purpose of the OCM/Minerva contract was to provide the fuel plaintiff had ordered for its vessel, the CAPTAIN X. KYRIAKOU. In addition to asserting claims against OCM, plaintiff clearly considers that it also has the right to claim against Minerva in the context of this tripartite transaction. Moreover, the attempted circumvention of claiming in tort rather than contract does not prevent plaintiff from being a third-party beneficiary bound to arbitrate under the OCM/Minerva contract, in part because that would enable plaintiff to

enjoy the benefits of being a third-party beneficiary under the contract without having to accept the terms and conditions upon which Minerva – through OCM, Seapoint's chosen bunker trader – sold the fuel.  Since plaintiff was a third-party beneficiary of the OCM/Minerva contract, it is legally and contractually bound by, and must comply with, the arbitration provision found in Clause 25 of Minerva's Terms.  Thus, the Court should stay plaintiff's assertion of claims against Minerva in this action so they can be asserted in their proper forum under the contract, which is arbitration in Geneva.

**CONCLUSION**

**FOR THE REASONS SET FORTH HEREIN, THIS HONORABLE COURT SHOULD GRANT THE MOTION BY DEFENDANT MINERVA BUNKERING (USA) LLC FOR A STAY OF PLAINTIFF'S CLAIMS AGAINST IT ON THE BASIS OF THE ARBITRATION CLAUSE IN THE BUNKER SUPPLY CONTRACT BETWEEN <u>MINERVA AND CO-DEFENDANT OCEANCONNECT MARINE</u>**

Dated: New York, NY
        November 13, 2020

                                        Respectfully submitted,

                                        Defendant
                                        MINERVA BUNKERING (USA) LLC

                              By: <u>s/ *Keith W. Heard*          </u>

                                        Keith W. Heard
                                        LENNON, MURPHY & PHILLIPS, LLC
                                        420 Lexington Ave., Ste. 300
                                        New York, New York 10170
                                        (212) 490-6050 (T)
                                        (212) 490-6070 (F)
                                        kwh@lmplaw.net